ADAM C., a Minor, By and Through    :
His Parent, Maura C., and MAURA C., :    NO.: 3:07-00532
       Plaintiffs    :
                :    (JUDGE CAPUTO)
v.    :    (MAGISTRATE JUDGE PRINCE)
                :
SCRANTON SCHOOL DISTRICT,    :
NORTHEASTERN INTERMEDIATE    :
EDUCATIONAL UNIT, and    :
LOURDESMONT SCHOOL,    :
       Defendants    :
_____:_____

# REPORT AND RECOMMENDATION

Pursuant to an Order entered on November 9, 2010 (Doc. 162), Honorable A. Richard Caputo referred defendants' pending motions for summary judgment (Docs. 126, 129, 154) to the undersigned Magistrate Judge.

## I. Background

This case arises from a single incident on April 27, 2005: a physical altercation—which, for simplicity's sake, can be called a fight—between plaintiff Adam C and another minor attending the partial-hospitalization program at Lourdesmont School,[1] which plaintiffs claim resulted in numerous and serious injuries to Adam. Plaintiffs have brought claims against the three defendants for damages and other relief under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C.A. §§ 1400–82 (West 2010); section 504 of the Rehabilitation Act of 1973, 29 U.S.C.A. § 794 (West

---

[1]Lourdesmont School is properly designated Good Shepherd Corporation, Clarks Summit, Pennsylvania. (Doc. 155, ¶ 3; Doc. 160, ¶ 3.) The term used throughout this Report and Recommendation will nonetheless be Lourdesmont, as it is by this name that this defendant, the other parties, and the deponents consistently refer to it.

2010); the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C.A. §§ 12111–12213 (West 2010); and other common-law doctrines.

*(A) Facts of the case*

The facts as recounted here are drawn from the defendants' statement of facts and the plaintiffs' responses. Unless otherwise noted, the facts are not subject to a genuine dispute. Given the complexity of the facts and the sometimes contradicting testimony that the parties cited, the contradictory portions will be detailed here in lieu of an attempt to selectively weave a smoother narrative. In instances where the parties have cited to portions of deposition transcripts or other documentary evidence not included in the exhibits to the pending motions and responses, these omissions are footnoted when appropriate.

(1) The parties

Plaintiff Adam C. was a minor residing in the Scranton School District (District). (Doc. 155, ¶ 1; Doc. 160, ¶ 1.) His parents, Dennis and Maura C., were initially both plaintiffs in this case as well; his mother Maura remains a plaintiff, but Dennis withdrew his claims on April 7, 2009. (Doc. 155, ¶ 2; Doc. 160, ¶ 2.)

Although the details of the arrangements among the defendants are at issue, the situation was roughly as follows. The District had an agreement with Lourdesmont, which is run by the Sisters of the Good Shepherd (Neri Dep. 35:4–13, July 14, 2009, Doc. 130-6, at 3)[2] under which certain of its students who "couldn't be handled in the existing public school setting" would be placed at Lourdesmont for its partial-hospitalization program (King Dep. 15:24–16:3, May 4, 2009, Doc. 144-17, at 2–3). Operating on an oral

---

[2]Lourdesmont further alleged that it is not a public entity and that it is a privately owned institution, citing portions of Neri's deposition. However, those portions of the deposition are not in the record. Plaintiffs disputed these claims, although they did not provide citations to the record.

agreement, the Northeastern Educational Intermediate Unit (NEIU) provided educational services at Lourdesmont, while Lourdesmont itself provided mental-health services. (Lamanna Dep. 14:3–2, May 4, 2009, Doc. 134-2, at 58; Neri Dep. 34:22–25, Doc. 130-6, at 3.) This arrangement had been in place since 1972. (Neri Dep. 34:25–35:2, Doc. 130-6, at 3.[3])

(2) Why Adam was placed at Lourdesmont

Maura was the first to bring up the possibility of Lourdesmont as a placement for Adam. (Maura C. Dep. 70:1–3, May 1, 2009, Doc. 134, at 22.) She had been a student at Lourdesmont and had also worked as a cleaner for Sisters of the Good Shepherd around 2002–2003. (*Id.* 105:15–17; *id.* 106:18–107:10, Doc. 134, at 31.) From her time as a cleaner and as a student, Maura knew a number of the teachers, including the gym teacher, the art teacher, the shop teacher, and the cook, as well as several of the therapists. (*Id.* 109:15–20, Doc. 134, at 35.)

Yet as Maura described it, her suggestion of Lourdesmont was not entirely voluntary; at the time that she brought it up, she felt that she "had no alternatives." (*Id.* 124:16–125:2, Doc. 134, at 35.) She recounted a "meeting prior to the Lourdesmont conversation" in which she "was told point-blank by one of the supervisors of Scranton School District that [she] would find somewhere for Adam to go, period." (*Id.* 67:7–68:3, Doc. 134, at 21.) "You better find him somewhere to go or you're going to wind up back in front of the judge, and it's going to be handled like that," she recalled being told. (*Id.*) She believed that if she had not sent Adam to Lourdesmont, she would have been sent to jail for truancy. (*Id.* 124:16–125:2, Doc. 134, at 35.)

---

[3] NEIU cited Neri Dep. 34 in its Statement of Material Facts, but no portion of Neri's deposition appears in NEIU's exhibits. The document cited in the text accompanying this footnote is from the District's exhibits.

Adam, by comparison, testified that he was transferred to Lourdesmont because he "couldn't be homeschooled because [he] kept chasing the teachers around." (Adam C. Dep. 18:2–9, May 1, 2009, Doc. 134-2, at 4.)

### (3) Procedure leading to Adam's placement at Lourdesmont

Two to three weeks before Adam was placed at Lourdesmont, an interagency meeting convened that included that District, Lourdesmont, NEIU personnel, the Bethesda Day Treatment Center, the teacher, and the parent.[4] (Doc. 126-5, ¶ 15; Doc. 141, ¶ 15.) Also present were personnel from Lackawanna County Juvenile Probation and the Advocacy Alliance; individuals familiar with Adam's history and past placement; and Adam's behavioral therapist. (Doc. 130, ¶ 3; Doc. 142, ¶ 3.) At the meeting, it was decided that any problems with Adam were to be directed to his mother; he was not to be disciplined by behavior staff. (Doc. 126-5, ¶ 16; Doc. 141, ¶ 16.)

As part of Lourdesmont's standard matriculation procedure, Adam needed a psychiatrist to evaluate him to establish medical necessity before he could actually begin attending. (Neri Dep. 41:14–18, Doc. 130-6, at 5; Maura C. Dep. 71:5–14, Doc. 134, at 22;[5] *see also* Lamanna Dep. 12:13–23, Doc. 134-2, at 57.[6]) Mark Fallon, NEIU employee and supervisor of the educational staff at Lourdesmont (Doc. 126-5, ¶ 13, Doc. 141, ¶ 13,

---

[4]The phrase "the teacher and the parent" was part of a factual averment made by NEIU to which plaintiffs admitted. (Doc. 126-5, ¶ 15; Doc. 141, ¶ 15.) It can be reasonably inferred that "the parent" refers to Maura and possibly Dennis, but to whom "the teacher" refers is uncertain.

[5]Plaintiffs cited page 41 of Neri's deposition, but did not include this page among their twenty-seven exhibits.

[6]Plaintiffs contested Lamanna's testimony on this point, citing pages 19–20 of Neri's deposition, but those pages contain no testimony relevant to Lamanna's. (Doc. 141, ¶ 19.)

Fallon Dep. 57:3–17, Apr. 3, 2009, Doc. 130-13, at 3), testified that the NEIU "typically [had] almost no[]" involvement in the admissions process. (Fallon Dep. 50:5–8, Doc. 134-2, at 53.)

Once Lourdesmont accepted Adam into its program,[7] an Individualized Education Program (IEP) was developed, which recommended that Adam be placed into the emotional-support classroom at Lourdesmont, full-time, and receive individual group therapy there, as well as medical attention as needed. (Doc. 130, ¶ 7; Doc. 142, ¶ 7.)

### (4) Intake procedure upon placement at Lourdesmont

Typically, when students first came to Lourdesmont, they went to a diagnostic class for twenty days so that the teacher could test them and gauge their level of performance. (Doc. 126-5, ¶ 29; Doc. 141, ¶ 29.) Lourdesmont was responsible for the intake testing. (Doc. 126-5, ¶ 31; Doc. 141, ¶ 31). A Lourdesmont therapist conducted social and emotional assessments; an NEIU teacher administered reading and math assessments to determine appropriate classroom placement. (*Id.*; Krieg-Grace Dep. 38:1–24, Apr. 3, 2009, Doc. 134-2, at 41.[8])

However, Lourdesmont placed Adam into the classroom immediately "so he wouldn't have to make a change." (Doc. 126-5, ¶ 30; Doc. 141, ¶ 30.) His starting date was April 5, 2004.[9] (Report of Andrew M. Klein, Doc. 144-23, at 8; Doc. 155, ¶ 10; Doc.

---

[7]Plaintiffs cited Carr Dep. 95 for the proposition that District students who attend Lourdesmont were "made to withdraw from the District the day before they begin attending Lourdesmont," but did not include page 95 among their exhibits. (Doc. 142, ¶ 39.)

[8]Plaintiffs cited Krieg-Grace Dep. 38 but did not include it in their exhibits; material from page 38 is drawn from NEIU's exhibits.

[9]Plaintiffs incorrectly state that Adam began attending Lourdesmont in March 2004. (*E.g.*, Doc. 142, ¶ 8.)

160, ¶ 10; Neri Dep. 42:24–43:1, Doc. 130-6, at 5; Maura C. Dep. 66:21–24, Doc. 134, at 21.) He was placed in Janet Krieg-Grace's self-contained classroom—a classroom in which students did not change classrooms between periods, instead being taught by the same instructor for all academic subjects—and for the duration of his time at Lourdesmont received instruction from Ms. Krieg-Grace in reading, math, social studies, and science.[10] (Krieg-Grace Dep. 35:19–23, Doc. 130-9, at 3; Doc. 126-5, ¶¶ 11, 24; Doc. 141, ¶¶ 11, 24.)

### (5) Lourdesmont's funding

Lourdesmont received parts of its funds from the federal government. According to Judith Neri, Chief Operating Officer for Lourdesmont, Lourdesmont receives the following forms of federal funding: medical assistance for patients in the partial-hospitalization program; a "fee for service" program; and "Title I funding and the free lunch program but which monies are from the residential components of the program." (Doc. 155, ¶ 16; Doc. 160, ¶ 16.)[11]

### (6) Provision of educational and therapeutic services at Lourdesmont

Although there was no written agreement governing the delegation of responsibility for students at Lourdesmont (Lamanna Dep. 14:10–14, Doc. 130-2, at 4), the understanding among employees and officials of Lourdesmont and the NEIU was consistent: the NEIU provided the educational component and Lourdesmont provided the partial-hospitalization component. Judith Neri, Chief Operating Officer for Lourdesmont (Doc. 155, ¶ 16; Doc.

---

[10]Plaintiffs incorrectly described Alyssa Adams, Adam's primary therapist, as a classroom instructor. (Doc. 142, ¶ 23.)

[11]Lourdesmont cited Neri Dep. 47–49, but Lourdesmont did not submit these pages as exhibits to their motion for summary judgment. However, plaintiffs admitted to these claims about Lourdesmont's funding.

160, ¶ 16), provided perhaps the most concise summary of the relationship between the NEIU and Lourdesmont:

> The NEIU is responsible for educating the clients and providing any related services that go with that. If there's speech therapy or occupational therapy or any of those, they do the paperwork. They have the responsibility for curriculum development, for training the teachers, for staffing the classrooms, designing the structure of the educational services, if there's going to be team teaching or however they would want that to run. Lourdesmont has the responsibility of implementing the Partial Hospitalization Program in collaboration with or in conjunction with or somehow blending the two during a school day in terms of hours.

(Neri Dep. 38:21–39:15, Doc. 130-6, at 4.) Others echoed a similar understanding of the division of responsibility, including Clarence Lamanna, Director of Special Education at NEIU (Lamanna Dep. 5:20–22, Doc. 134-2, at 56; *id.* 13:18–14:4, Doc. 134-2, at 58); and Barry Rogers, Principal of Lourdesmont since April 1, 2001 (Rogers Dep. 56:10–11, July 14, 2009, Doc. 144-12, at 17; *id.* 63:12–64:15, Doc. 144-12, at 20). Further, all teachers at Lourdesmont were employees of the NEIU. (Adams Dep. 33:6–8, July 14, 2009, Doc. 156-2, at 7; Krieg-Grace Dep. 134:14–15, Doc. 156-2, at 11 ("I was doing the teaching part. The partial hospitalization came in with the therapy.").)[12]

William King, acting superintendent of Scranton School District (King Dep. 4:23–25, Doc. 130-12, at 1), described the relationship between the NEIU and Lourdesmont somewhat differently, calling Lourdesmont the "educational vendor" for the District, and saying that "once an IEP had been developed and the student was placed" at Lourdesmont, Lourdesmont would be responsible for "oversee[ing the] child's complete academic program" and for "tak[ing] responsibility for the day-to-day carrying out of disciplining the student." (*Id.* 14:6–15:15, Doc. 144-17, at 1–2.) This gloss on the NEIU–Lourdesmont relationship is reminiscent of Rogers' description of the "educational objectives and

---

[12] Plaintiffs disputed this averment without any reference to the record. (Doc. 160, ¶ 12.)

components of the program" as "[t]hose components that each year have to be discussed with the Intermediate Unit." (Rogers Dep. 63:12–64:15, Doc. 144-12, at 20.) Yet Rogers stressed that he "never had ultimate authority" over the educational component and neither observed nor evaluated teachers. (*Id.* 59:3–20, Doc. 144-12, at 19.) Further, Mark Fallon, the supervisor of the educational staff at Lourdesmont, was an NEIU employee. (Fallon Dep. 57:3–17, Doc. 130-13, at 3.) And despite Lourdesmont's importunate remonstrations that it was not actually a school and did not provide education to its attendees, Lourdesmont had a private academic license. (Neri Dep. 51:11–20, Doc. 144-10, at 15; *see also* Rogers Dep. 76:24–77:3, Doc. 144-12, at 27–28 (stating that Lourdesmont was licensed by the Pennsylvania Department of Education).)

### (7) Management and division of responsibility among defendants

#### (a) The District–NEIU contract

An agreement dated March 1, 2004, with an effective date of July 1, 2004,[13] outlines the responsibilities of the District and NEIU. (Doc. 130-8; *id.* at 6 ¶ 14.) The contract required the NEIU to "provide and operate" a variety of "programs and services" including the following:

- appropriately certified, licensed, or trained professional or paraprofessional staff, and supervision of them
- classroom management, curriculum development, and provision of inservice programs, training, and mentor programs to NEIU staff

(*Id.* at 1 ¶ 1.) The contract also required the District to make certain provisions, including:

- "regular education support and ancillary services," including counseling, physical education, food, and mainstream instruction as necessary

---

[13]Nothing in the record indicates that a similar or any other contract was in effect at the time that Adam was being considered for, and eventually admitted to, Lourdesmont.

- "[s]uch action or cooperation as is required" to ensure that District residents that participate in a program operating under the contract receive FAPE

(*Id.* at 4 ¶ 10.) Responsibility for IEP development and revision was left to "[t]he District, in cooperation with the Intermediate Unit." (*Id.* at 6 ¶ 13.)

### (b) Barry Rogers

As discussed above, Rogers disclaimed any responsibility over the educational component of the program at Lourdesmont. He did, however, concede that he was "the liaison between the educational program and other educational agencies," which required him to "interpret[] for them the educational objectives and components of the program." (Rogers Dep. 63:12–64:15, Doc. 144-2, at 20.) He said that the "other educational agencies" might be the NEIU or the school district and that the "educational program" was the program that the NEIU provides. (*Id.*) He also indicated that "client discipline" was "usually [his] responsibility." (Rogers Dep. 62:12–16; 63:3–4, Doc. 144-2, at 20.)

Although Mark Fallon was the supervisor for the NEIU educational staff placed at Lourdesmont, Fallon was only on site at Lourdesmont two half-days per week. (Fallon Dep. 11:2–14, Doc. 144-18, at 1.) The rest of the time, NEIU teachers were to report to Rogers and direct any concerns to him. (*Id.* 12:14–19, Doc. 144-18, at 2; Krieg-Grace Dep. 20:7–21, 21:18–23, Doc. 144-3, at 1, 2; McDonald Dep. 59:11–21, Doc. 144-8, at 17.) Rogers, however, testified that his secretary was the only person at Lourdesmont who reported to him directly and firmly stated that he did not directly supervise any NEIU employees. (Rogers Dep. 56:3–9, Doc. 144-12, at 17.) Judith Neri, Chief Operating Officer for Lourdesmont, suggested that when Rogers testified, he was confusing "what he's doing presently with what he was doing in April 2005," and should have known that he was supervisor to the Lourdesmont Behavior Support Staff. (Neri Dep. 13:24–14:11, Doc. 144-10, at 2–3.)

Neri testified that day-to-day management and enforcement of student discipline was the responsibility of Barry Rogers (Neri Dep. 26–27, Doc. 144-10, at 8–9), but Rogers described student discipline as the joint responsibility of Lourdesmont and the NEIU (Rogers Dep. 19:10–20:10, Doc. 144-12, at 3–4). (*See also id*. at 50:4–7, Doc. 130-15, at 4 ("We report to the districts any disciplinary action. Other than that, the school districts, once someone is admitted to Lourdesmont, that is handled on site usually.").)

Six weeks after the fight, on June 9, 2005, Barry Rogers sat in as Local Education Agency (LEA) for an IEP meeting. (Carr Dep. 76:10–18, May 4, 2009, Doc. 144-19, at 5.) Rogers testified that he had signed IEPs as the LEA in the past, but said he stopped doing that when "P.D.E.[14] said that was not supposed to happen," and described the question of whether Abington or Scranton was the LEA had been "a fuzzy area for many years." (Rogers Dep. 124:12–17, Doc. 144-12, at 29.)

### (c) Lamanna and the NEIU

According to Clarence Lamanna, Director of Special Education at the NEIU, NEIU had the "responsibility to implement [Adam's] IEP as it is written and then to work in concert with the mental health staff at Lourdesmont." (Lamanna Dep. 22:12–25, Doc. 130-2, at 6.) By his understanding, responsibility for implementing the academic goals of the IEP was vested with the LEA, which he stated was the Scranton School District. (*Id.* 29:11–20, Doc. 130-2, at 7.)[15]

Lamanna himself was responsible for "coordinating all of the programs and services related to special education for [the NEIU's] constituent school districts." (*Id.* 5:20–6:1, Doc. 130-2, at 2.)

---

[14]"P.D.E." is presumably a reference to the Pennsylvania Department of Education.

[15]The District also cited Lamanna Dep. 28, but neither the District nor any other party included page 28 in their exhibits.

Adam described Lourdesmont as being a "very good place" to him. (Adam C. Dep. 53:19–54:8, Doc. 134-2, at 13–14.) He reported liking all of the teachers, and said he was "very popular" until Arthur—the student he got into a fight with in April 2005—came in. (*Id.*) During the deposition, which took place more than four years after the fight giving rise to this case, Adam indicated that he would like to go back to Lourdesmont. (*Id.*) He said that nobody there other than Arthur gave him any problems. (*Id.* 33:3–5, Doc. 134-2, at 8.)

(9) Adam's social skills and behavioral history

Some of the people that worked with Adam were asked about his behavior prior to April 2005. His teacher, Janet Krieg-Grace, testified that Adam "absolutely" had "needs in the area of social skills," and also needed to work on anger management, successful conflict resolution, and interpersonal interaction. (Krieg-Grace Dep. 44:2–12, Doc. 144-3, at 11.) His primary therapist, Alyssa Adams, said that although Adam had "good interpersonal relationships with adults," his relationships with his peers were "poor." (Adams Dep. 44:1–17, Doc. 144-11, at 15.) She concurred with Ms. Krieg-Grace, agreeing that Adam needed to learn how to manage anger, aggression, and conflicts. (*Id.*) The aide in Ms. Krieg-Grace's classroom, Janice McDonald, estimated that aside from the fight with Arthur on April 27, 2005, Adam had gotten into around twenty other fights with kids at Lourdesmont. (McDonald Dep. 28:24–29:15, Apr. 3, 2009, Doc. 144-8, at 5; Doc. 130-10, at 3.)[16]

---

[16]Plaintiffs cited pages 28–29 of McDonald's deposition, but only included page 28 with their exhibits. Page 29 came from the District's exhibits; the District did not include page 28.

Despite Adam's problems getting along with his peers and maintaining control of his emotions, Ms. Krieg-Grace reported that Adam was doing "very well" with his social and emotional progress, giving a narrative of his development:

> When he first came to Lourdesmont, we were told not to—he couldn't eat in the cafeteria. He couldn't be left alone. But, again, never confront him.
>        And it took about six months, but I used to go down to the cafeteria and sit with him every day. When he first started, we didn't try it. But then I said, "Do you want to try to eat in the cafeteria?"
>        He said, "Yeah. We can try." And then he would say, "As long as you go with me." And I went with him. And for about a year and a half I sat with him and we ate lunch together at a table. And then other kid started joining us at that table. Then he started making friends, talking to other kids.
>        Anyway, I would start weeding myself away. I might get up and leave for ten mintues and then come back. Or I might get up and go talk to another teacher that was there and then come back. And then eventually Adam just started going to the cafeteria himself, which was a huge accomplishment, as far as I was concerned.

(Krieg-Grace Dep. 42:11–43:11, Doc. 134-2, at 42.)

### (10) The environment at Lourdesmont

As of April 2005, there were three Behavior Support Staff and one Resource Officer at Lourdesmont. (Neri Dep. 11:7–20, Doc. 144-10, at 1.) The Behavior Support Staff were Lourdesmont employees. (Rogers Dep. 25:23–26:2, Doc. 144-12, at 5–6.) Although there were three members of the Behavior Support team, there were times that only one member was on site to manage the needs presented by the 150 students at Lourdesmont. (McDonald Dep. 48:1–8, Doc. 144-8, at 9.) Janice McDonald, certified paraprofessional at Lourdesmont and classroom assistant to Ms. Krieg-Grace (*Id.* 9:1–10:14, 12:19–21, Doc. 134-2, at 66), said she "never felt safe" at Lourdesmont "because there [were] fights breaking out all the time and there was no one there. If Mike [one of the Behavior Support team members] was involved in another fight and there was a fight in your classroom, you would have to deal with it." (*Id.* 48:1–8, Doc. 144-8, at 10. *See also id.* 39:7–9, Doc. 130-10, at 5 (explaining that there were often physical fights at Lourdesmont).)

"[K]ids were always getting hurt," said Ms. McDonald (*id.* 51:23–24, Doc. 144-8, at 12), but it was not just the students who suffered injuries. One teacher was "out for a while" because of an arm injury caused by a student. (*Id.* 51:1–6, Doc. 144-8, at 12.) Another "had a door slam" and had to get stitches in his head. (*Id.* 51:7–9, Doc. 144-8, at 12.) Ms. McDonald knew of nothing that Lourdesmont did to try to prevent future fights. (*Id.* 52:19–2, Doc. 144-8, at 13.) She had been told by Lourdesmont not to call the police if a fight broke out among students; in fact, she said, "[u]sually Lourdesmont would send [the police] away . . . if they came up for riots." (*Id.* 53:3–7, Doc. 144-8, at 4.)

Echoing Ms. McDonald, Ms. Krieg-Grace reported feeling even before the fight between Adam and Arthur that "[i]t was only a matter of time" before "somebody was going to get hurt." (Krieg-Grace Dep. 65:4–6, Doc. 144-3, at 22.) "[T]here were fights every day," she said. (*Id.* 130:17–22, Doc. 144-3, at 30.) "Every day. . . . [L]ike one day, the kids ripped the faucet off the wall. Another time, it was nothing for them to urinate in the hallway. Fights broke out all the time." (*Id.* ) She felt that the safeguards at Lourdesmont were inadequate to keep students from getting hurt. (*Id.* 66:17–23, Doc. 144-3, at 23.) After she "tried everything that [she] could think of" to control the students in her classroom, Ms. Krieg-Grace called one of the behavior specialists at the NEIU, and asked someone to come and observe her classroom and suggest some other strategies that she could use. (*Id.* 68:3–24, Doc. 144-3, at 24.) In response to this request, Theresa Bilenski, assistant special-education director for NEIU, came to Ms. Krieg-Grace's classroom and substituted for her one day; her response afterward was "that she feared for her life." (*Id.* 68:20–69:8, Doc. 144-3, at 25.) Later, when Ms. Krieg-Grace brought up her concerns about student behavior in a meeting, Lourdesmont principal Barry Rogers "started yelling at [her] that [she] was just overreacting to everything." (*Id.* 70:6–12, Doc. 144-3, at 26.)

According to Robert A. Gerrity, Chief of Police of the South Abington Township Police Department, the Police Department's records show that the police had been called

to respond to incidents at Lourdesmont approximately 312 times between January 2000 and July 2009, for matters involving assaults, disorderly conduct, mental-health issues, criminal mischief, drug violations, and runaways. (Gerrity Aff. ¶¶ 1, 5, July 23, 2009, Doc. 144-3, at 1–2.)

(11) Training, policies, and qualifications of personnel at Lourdesmont and the NEIU

(a) Training of Lourdesmont employees

Principal of Lourdesmont Barry Rogers indicated that Lourdesmont employees had to undergo a "whole battery" of JKM training, a kind of crisis-management training, before they could work alone with children. (Rogers Dep. 37:3–19, Doc. 144-12, at 9.) Without this training, they would have to have another staff member with them when working with children. (*Id.*) Judith Neri, speaking as Chief Operating Officer for Lourdesmont, said that the three Behavior Support Staff at Lourdesmont in April 2005 underwent JKM training, but had undergone no other training specific to their position. (Neri Dep. 14:12–16:8, Doc. 144-10, at 3–5.).[17]

According to Ms. Krieg-Grace, Adam was the first student that Lourdesmont had accepted with Asperger's Syndrome, a disability on the autistic spectrum. (Krieg-Grace Dep. 35:2–8, Doc. 144-3, at 9.) There was no separate autistic-support class at Lourdesmont (*id.* 37:1–2, Doc. 144-3, at 10), and no staff at Lourdesmont had any specialized training in dealing with students suffering from autistic-spectrum disorders (Neri Dep. 44:18–23, Doc. 144-10, at 13.)

---

[17]Plaintiffs also cited Adams Dep. 36–38 regarding her training in deescalation techniques and physical restraints, but these pages are not in the record. (*See, e.g.*, Doc. 159, at 9 ¶ 6.)

(b) Training of NEIU employees

As supervisor of the educational staff at Lourdesmont, and on behalf of the NEIU, Mark Fallon was qualified to provide training to teachers and aides stationed at Lourdesmont on how to prevent fights between students. (Fallon Dep. 13:7–14:6, Doc. 134-2, at 51.) However, despite being qualified, he never actually did any training on fight prevention. (*Id.*) His qualifications extended only to training for preventing fights, and he was not qualified to train in deescalation techniques. (*Id.*) He testified that the NEIU provided "staff development" on how to prevent fights and "offered things to the teachers that [would allow them to] become trained in crisis management and things like that," but none of these courses or seminars were mandatory. (*Id.*)

Ms. McDonald received no training from Lourdesmont whatsoever. The NEIU did not train her in behavioral strategies to help implement IEPs, nor in behavioral management, nor in the use of restraints. (McDonald Dep. 27:21–28:23, Doc. 144-8, at 4–5.) Ms. Krieg-Grace was told never to confront Adam or to argue back with him, but received no special training in any behavior-management techniques to use with him. (Krieg-Grace Dep. 27:23–28:5, Doc. 130-9, at 2.)[18]

(c) Policy at Lourdesmont on intervening in fights between students

Lourdesmont staff were allowed to intervene in fights only if they had undergone JKM training, since "more harm can be done if [staff] put their hands on the kids and don't know how to do proper holds." (Neri Dep. 80:25–81:9, July 14, 2009, Doc. 130-6, at 7–8.) NEIU staff were not authorized to physically intervene in a physical fight

---

[18]Plaintiffs cited Krieg-Grace Dep. 27–28, but did not include page 28 in their exhibits; page 28 came from the District's exhibits. (Doc. 141, ¶ 18.) Plaintiffs also cited Krieg-Grace Dep. 59 for the proposition that nine times out of ten, the strategies that behavioral specialists offered for preventing fights would not work, but page 59 is not among plaintiffs' exhibits. (Doc. 144, at 21.)

between students at all; if a fight broke out, NEIU staff were to call Behavior Support Staff. (McDonald Dep. 98:1–9, Doc. 134-2, at 72.) In Ms. Krieg-Grace's classroom, there were no telephones, so if a fight loomed or occurred, staff had to push a buzzer and "wait for somebody to answer that call." (Krieg-Grace Dep. 53:24–54:2, Doc. 130-9, at 7.)[19] When the buzzer was pushed, the alert went to a secretary on the first floor, who then had to place a call to Behavior Staff on the second floor. (*Id.* 54:2–4, Doc. 130-9, at 7.)


### (d) Alyssa Adams

Alyssa Adams graduated from college in May 2004 and started work at Lourdesmont in January 2005. (Adams Dep. 12:17–21, Doc. 144-11, at 2.) The position that she held, primary therapist, required in its job description a master's degree in social work, counseling, rehabilitation counseling, or psychology or a bachelor's degree with some work toward a master's degree in those fields and related employment experience. (*Id.* 14:9–20, Doc. 144-11, at 4.) Although Adams had an undergraduate degree and related employment experience, there is no indication that she had done any work toward a master's degree. (*Id.*)


### (e) Barry Rogers

The job description for the principal position at Lourdesmont required a master's degree in educational administration, but at the time that Rogers took the position, he did not have such a degree. (Rogers Dep. 72:4–9, Doc. 144-12, at 23.) He did not obtain his degree until August 2007. (*Id.* 72:10–18, 75:2–11, Doc. 144-12, at 23, 26.) Nor did he have the background in psychology or special education that his job description indicated that he should. (*Id.* 72:19–73:4, Doc. 144-12, at 23–24.) He lacked the requisite special-education certifications. (*Id.* 73:5–7, Doc. 144-12, at 24.)

---

[19]Plaintiffs cited Krieg-Grace Dep. 53–54, but did not include these pages in their exhibits; reference is to the District's exhibits. (Doc. 159, at 13 ¶ 35.)

(12) Leading up to the fight

Arthur came to Lourdesmont one to two months before he and Adam got into the fight that forms the basis of plaintiffs' case. (Krieg-Grace Dep. 25:14–26:1, Doc. 130-9, at 2; McDonald Dep. 35:3–8, Doc. 130-10, at 4.) He was placed in Ms. Krieg-Grace's classroom, where Adam was already a student. (Krieg-Grace Dep. 25:14–26:1, Doc. 130-9, at 2.) According to Ms. Krieg-Grace, Arthur had "behavior issues," and "would say things to different kids that would just disrupt the flow of [the] classroom." (*Id.* 44:19–25, Doc. 144-3, at 11; McDonald Dep. 35:15, Doc. 144-8, at 7 (describing Arthur as "just an angry kid, very angry").) Arthur was troublesome enough for Ms. Krieg-Grace that at one point, she "pulled [his] desk all the way to the front [of] the class" because she "did not want him to be looking at anybody, saying anything to anybody." (Krieg-Grace Dep. 45:3–9, Doc. 144-3, at 12; McDonald Dep. 30:17–20, Doc. 144-8, at 6.)


(13) The fight on April 27, 2005

On the morning of April 27, Adam appeared "a little agitated." (Krieg-Grace Dep. 47:13–19, Doc. 130-9, at 5.) Ms. Krieg-Grace saw "hints" that Adam and Arthur "did not get along," and reported that there had been "looks" and "words said between them." (*Id.*) She also noticed that Arthur was wearing rings on his fingers on the morning of the fight (*Id.* 48:3–9, Doc. 144-3, at 15), which appears to have been permissible under Lourdesmont's policy at the time. At the time of the fight, though, Ms. Krieg-Grace was not in the classroom. (Doc. 126-5; ¶ 34; Doc. 141, ¶ 4; Doc. 130, ¶ 30; Doc. 142, ¶ 30; Krieg-Grace Dep. 53:8–12, Doc. 130-9, at 7.) She had gone to the computer room to catch up on IEP paperwork while her class attended a group-therapy session with Alyssa Adams in a different room. (*Id.*) Ms. Krieg-Grace's absence was permissible under Lourdesmont policies; the teacher was allowed to leave the classroom during group-therapy sessions provided that the therapist and another adult were in the classroom with the students. (*Id.* 50:3–9, Doc. 130-9, at 6.) As long as the therapist and other adult knew

where the teacher was, and the teacher was "on call," the teacher did not need to be present for the therapy session. (*Id.*) The only two adults in the room were Alyssa Adams, therapist, and Janice McDonald, classroom aide to Ms. Krieg-Grace. (Doc. 126-5; ¶ 34; Doc. 141, ¶ 4; Doc. 130, ¶ 30; Doc. 142, ¶ 30.) Both women were of slight build; Ms. McDonald was 5'1" and Ms. Adams was 5'2½". (McDonald Dep. 69:23–25, Doc. 144-8, at 18; Adams Dep. 62:9–17, Doc. 144-11, at 16.)

The events of the fight were described in a Recordable Incident report dated April 28, 2005, the day after the fight, which is reproduced here, unedited and in full:

Incident occurred at 1:00pm during a group therapy session in classroom 207. Arthur T. and Adam C. were disagreeing on what teacher was helping Arthur T. with his math that morning. Alyssa Adams, the therapist, redirected Adam C. and Arthur T. to stop arguing. Adam C. and Arthur T. did not respond to redirection. At this time, Janice McDonald, the teaching assistant, also helped redirect the Adam C. and Arthur T.. They did not respond to her redirection either. Both students were arguing (i.e. verbally aggressive toward each other and were cursing). Mrs. McDonald and Alyssa continued to try and redirect the students but they again did not respond to redirection. At this point, Mrs. McDonald used buzzer to call for behavior staff to come to classroom 207 to intervene before verbal argument escalated. Both students were verbally threatening to each other. Adam C. stood up first and was taunting Arthur T. to enter into a physical fight. Both Mrs. McDonald and Alyssa continued to try and calm the students and redirect both Adam C. and Arthur T as they continued arguing. Arthur T. slapped Adam C. across the face. Adam C. pushed Arthur T. back, away from him. At this point, Mrs. McDonald instructed the students in the class to move away from the fight to the back of the room. Also during this time, Alyssa left room to get officer to intervene in the fight. Four students ran out of the room into the hallway following Alyssa. While in the classroom, Arthur T. punched Adam C. on the side of the head. Adam C. swung at Arthur T. and both students continued to throw punches. Arthur T. was walking toward door to exit room when Adam C. threw a chair in the classroom. Mrs. McDonald again tried to calm Adam and redirect his destructive behaviors. Adam C. responded by throwing two desks in the classroom. During this time, Alyssa walked Arthur, who was in the hallway at this time, downstairs to another classroom. Alyssa calmed Arthur while walking him downstairs. Arthur T. remained in this classroom. Mrs. McDonald calmed Adam C. while in classroom 207 until Mike, behavior staff, arrived. Mike took Adam C. to nurse, while Arthur T. waited in officer's room. Alyssa returned to classroom to finish group session. Mrs. McDonald remained in classroom 207 until the completion of group.

(Recordable Incident Report, Apr. 28, 2005, Doc. 144-7, at 3.) Lourdesmont has accepted this report as a true and accurate account of what happened that day. (Neri Dep. 20:12–18, Doc. 144-10, at 7.) Plaintiffs claim that both NEIU and the District have similarly accepted the report as true and accurate, citing Lamanna Dep. 45–46 and Carr Dep. 78, respectively, but these pages of the transcripts are not in the record. (*See, e.g.*, Doc. 142, ¶ 33.)

Ms. McDonald, who witnessed the entire fight (McDonald Dep. 13:10–14, Doc. 130-10, at 2), recalled the fight in a manner largely consistent with the Recordable Incident report, with some discrepancies and addition of minor details. She testified that she did not see who threw the first punch. (*Id.* 31:11–13, Doc. 130-10, at 3.) Adam and Arthur were "fighting over Janet [Krieg-Grace]," she said, and the fight lasted "just a couple of minutes." (*Id.* 44:22, 31:23–25, Doc. 130-10, at 6, 3.)

Alyssa Adams' recollection was also largely consistent with the report. According to her, Arthur first slapped Adam. (Adams Dep. 20:2, Doc. 130-11, at 2.) Right after Adam pushed Arthur, Alyssa left the room to alert the behavior staff, reasoning that it was "faster to take a couple of steps out of the room, yell to get [the staff member's] attention and have him enter the room quickly." (*Id.* 20:10–21:5, Doc. 130-11, at 2; Doc. 144-11, at 9.) She clarified that Ms. McDonald had buzzed once already while Adam and Arthur were arguing. (*Id*. 21:6–22, Doc. 144-11, at 9.)

Adam testified briefly about the fight, saying that he got hit at least three times and that he "might have" hit Arthur "once or twice." (Adam C. Dep. 23:23–25, 34:1–8, Doc. 123-2, at 6, 9.) He said that the fight "happened real fast" (*id.* at 23:16–17, Doc. 134-2, at 6), too quickly for anyone to intervene before he got punched (*id.* at 67:8–11, Doc. 134-2, at 17). But Maura and a psychologist who produced a report on Adam both cautioned that

Adam's memory is unreliable. (Maura C. Dep. 131:10–13, Doc. 134-1, at 37[20] ("Adam is not always accurate in his recollection of things anymore. He has a tendency to integrate thoughts and events."); David J. Massari, Ph.D., Neuropsychological Expert Report, July 27, 2009, Doc. 144-28, at 6 ("Brain injury related deficits have been documented in memory, rapid information processing, and attention/working memory.").)

Once the fight was over and Arthur had left the room, Adam was still in the classroom, sitting on a chair, looking "really upset." (McDonald Dep. 37:2–16, Doc. 130-10, at 5.) Ms. McDonald neither noticed any physical injuries on him nor looked for any. (*Id.*) Lourdesmont called Adam's mother Maura, who came to pick him up; she noticed upon her arrival that one side of Adam's face was "black and blue, swollen, [and] very distorted." (Maura C. Dep. 157:1–14, Doc. 144-6, at 14.) One of his eyes was "turned." *Id.* 157:14–15, Doc. 144-6, at 14.) She took him to the emergency room at Mercy Hospital. (Doc. 155, ¶ 15; Doc. 160, ¶ 15.)

Lee Carr, on behalf of the District, testified that after the fight, despite Arthur's arrest, the District did not discipline Arthur, leaving the task to Lourdesmont because the district "doesn't do their discipline for them." (Carr Dep. 80:12–16, Doc. 144-19, at 6.) The District did not learn of the fight between Adam and Arthur until June 13, 2005. (Doc. 130, ¶ 40; Doc. 142, ¶ 40.)

Some months after the fight, on or near June 20, 2005, Adam complained of a headache and was admitted to Mercy Hospital.[21] (Maura C. Dep. 29:4–9, Doc. 144-6, at 5.) About a week later, Adam was sent to Geisinger Medical Center in Danville, Pennsylvania, where imaging revealed an aneurysm. (*Id.* 29:9–12, Doc. 144-6, at 5.) Shortly thereafter, on or around July 1, 2005, Adam's "traumatic giant aneurysm" was

---

[20]Plaintiffs cited Maura C. Dep. 131–133, but did not include these pages with their exhibits. The reference in the text accompanying this footnote is to NEIU's exhibits.

[21]The location of Mercy Hospital was unspecified.

reduced by surgery at Geisinger. (*Id.* 29:13–16, Doc. 144-6, at 5.) After the surgery, on or around July 7, 2005, Adam was discharged. (*Id.* 29:17–19, Doc. 144-6, at 5.)

On February 15, 2006, Adam was admitted to Lakeview Neurorehabilitation Center in New Hampshire. (Maura C. Dep. 33:25–34:3, Doc. 134-1, at 12–13; Doc. 144-6, at 6.)[22] He was admitted to Lakeview because he had "severe, violent headaches," caused by a "left shift" in his brain. (*Id.* 34:4–20, Doc. 144-6, at 6.) Maura C. testified: "[F]rom the surgery the blood buildup in his brain had actually shifted his brain to the left, causing severe headaches, and . . . every time the headaches would hit, Adam would become extremely violent, out of proportion to everything." (*Id.*)

He remained at Lakeview until the end of August 2008, when he came home for ocular surgery and the following lengthy recovery period; this was the last time, as of Maura's deposition in May 2009, that Adam was home. (*Id.* 14:14–21, 15:2–3, Doc. 144-6, at 1–2.) After his recovery was complete, in October or November 2008, Adam was refused readmittance to Lakeview. (*Id.*) He was then involuntarily committed to Brooke Glen Behavioral Hospital in Philadelphia due to his aggressive behavior occasioned by the headaches he continued to suffer, where he remained until mid-March 2009. (*Id.* 15:14–17, 18:11–18, Doc. 144-6, at 2; Doc. 134-1, at 9.) At that point, Adam was transferred by ambulance to Clarks Summit General Hospital; Brooke Glen "wanted him discharged to elsewhere, because they could not facilitate and help him in the manners that needed to be done." (*Id.* 19:8–20:5, Doc. 134-1, at 9.)

Adam never returned to Lourdesmont except for one day in June 2005. (Doc. 155, ¶ 15; Doc. 160, ¶ 15.) Adam reported and now claims damages for injuries including a subdural hematoma, a brain aneurysm, a fractured cheek bone, vascular headaches, ocular damage, and a decrease in IQ and cognitive functioning. (Doc. 130, ¶ 37; Doc. 142, ¶ 37.)

---

[22] Plaintiffs cited Maura C. Dep. 34 regarding the fact and date of Adam's admission to Lakeview, but the date of admission was on page 33, which plaintiffs did not include in their exhibits; for this page, reference is to NEIU's exhibits. (Doc. 159, at 18 ¶ 97.)

*(B) Procedural history*

This case originated on March 30, 2007, with plaintiffs' filing of their complaint in federal district court. (Doc. 1.) In August 2007, the three defendants answered the complaint, and each defendant cross-claimed against the other two. (Docs. 9, 12, 14.) After a full round of defendants' answers and amendments to answers to each others' cross-claims, as well as a number of motions for judgment on the pleadings (Docs. 18, 35, 38), plaintiffs filed an amended complaint on December 28, 2007 (Doc. 46), rendering the motions for judgment on the pleadings moot (Doc. 55). All defendants shortly moved to dismiss (Docs. 47, 49, 53), and the Court heard oral argument on the motions on April 21, 2008.

On September 23, 2008, the Court granted in part and denied in part the motions to dismiss. (Doc. 59.) In this order, the Court dismissed the compensatory-damages claim under the IDEA in Count I of the complaint; the § 1983 claims in Counts II, III,[23] and IV; and the loss-of-consortium claim under the IDEA and § 1983 in Count VII. (*Id.* at 28.) What survived the motions to dismiss were the compensatory-damages claim under section 504 in Count I against all defendants; the negligence claim in Count V against Lourdesmont; the breach-of-contract claim in Count VI against all defendants; and the loss-of-consortium claim under section 504 in Count VII against all defendants.

Following the Court's order of September 23, defendants answered the amended complaint, once again cross-claiming against each other and answering the cross-claims. (Docs. 62, 65, 66, 67, 68.) The case was referred to early mediation in November 2008, but no settlement was reached when negotiations concluded in January 2009. (Doc. 74, 77.)

---

[23] The Court advised plaintiffs that if they discovered facts showing a defendant's affirmative conduct that created an opportunity for an assault to occur, they could seek leave to amend the complaint (Doc. 59, at 22 n.8), but plaintiffs never sought such leave.

June 4, 2009, saw the filing of plaintiffs' second amended complaint, identical to the previous version except for an added Count VIII against all defendants under the ADA.[24] (Doc. 91.) Once again, and through the beginning of July 2009, defendants answered, cross-claimed, and answered cross-claims. (Docs. 92–98.)

The Court ordered that discovery be completed by September 30, 2009. (Doc. 103.) On December 10, the District moved to extend the time for dispositive motions, and upon concurrence of all counsel of record, the Court enlarged the deadline to January 30, 2010. (Docs. 110, 111.) The deadline was later extended again to March 30 and then to April 8, 2010. (Docs. 113, 121, 123.)

March 2010: defendants began to file motions for summary judgment. Lourdesmont filed its motion on March 18 (Doc. 117); NEIU and the District filed on April 5 (Docs. 126, 129). The full complement of supporting and related documents—briefs in support, briefs in opposition, reply briefs, statements and counterstatements of facts—were all timely filed. (Docs. 118, 119, 127, 130, 131, 133, 141, 142, 143, 144, 157.) Lourdesmont subsequently sought and obtained leave to amend or correct its submissions (Doc. 145, 149), refiling its materials on April 27 (Doc. 154–56.) Plaintiffs filed their brief in opposition and answer to Lourdesmont's statement of facts on May 11, 2010. (Docs. 159, 160.)

All filing deadlines having passed, the motions for summary judgment are now ripe for disposition.

---

[24] The second amended complaint reproduced verbatim those counts and claims that were dismissed by the Court's order of September 23, 2008; these claims and counts will not be addressed in the discussion in Part IV of this Report and Recommendation.

## II. Standard of Review

Federal Rule of Civil Procedure 56(c) requires the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Anderson*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1287–88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. When the party seeking summary judgment satisfies its burden under Rule 56(c) of identifying evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56(e) to go beyond the pleadings with affidavits, depositions, answers to interrogatories, or the like in order to demonstrate specific material facts that give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). When Rule 56(e) shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case that it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323; *see Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).


## III. Discussion

### (A) Compensatory damages under section 504 of the Rehabilitation Act

Section 504 reads:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of his or her disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

29 U.S.C.A. § 794 (West 2010). In the Third Circuit, a four-part test has been developed to determine whether a defendant has violated section 504. Here, plaintiffs must demonstrate that (1) Adam was disabled as defined by the Rehabilitation Act; (2) Adam was "otherwise qualified" to participate in school activities; (3) the school or its Board received federal financial assistance; and (4) Adam was "excluded from participation in, denied the benefits of, or subject to discrimination at, the school." *W.B. v. Matula*, 67 F.3d 484, 492 (3d Cir. 1995), *abrogated on other grounds by A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791 (3d Cir. 2007) (citing *Nathanson v. Med. Coll. of Pa.*, 926 F.3d 1368, 1380 (3d Cir. 1991)); 34 C.F.R. § 104.4(a).


### (1) Disability as defined by statute

The implementing regulations refer to a "handicapped person" rather than "individual with a disability," 34 C.F.R. § 104.4(a), (b), and define a person who "has a

physical or mental impairment [that] substantially limits one or more major life activities" as handicapped, *id.* § 104.3(j)(1). "Physical mental impairment" is defined to include "emotional or mental illness" and "specific learning disabilities"; "major life activities" include learning. *Id.* § 104.3(j)(2)(i), (ii).

Plaintiffs have introduced evidence that Adam suffered from a mental or emotional illness that interfered with the major life activity of learning. (*E.g.*, Report of David J. Massari, Ph.D., Aug. 11, 2009, Doc. 144-28, at 2 (listing Adam's diagnoses as including "Asperger's disorder, attention deficit hyperactivity disorder, oppositional defiant disorder, conduct disorder, bipolar disorder," and numerous others).) Indeed, the reason that Adam was admitted to Lourdesmont was because examinations of him established the medical necessity for him to attend a school designed to serve students whose disabilities prevented them from succeeding in a regular-education classroom. The record sufficiently shows that Adam is disabled as defined by the Rehabilitation Act.

### (2) "Otherwise qualified" to participate in school

In the context of elementary and secondary school, a "qualified" handicapped person is one "of any age during which it is mandatory under state law to provide such services to handicapped persons" or one "to whom a state is required to provide a free appropriate education under section 612 of the Education of the Handicapped Act." 34 C.F.R. § 104.3(*l*)(2). At the time, Adam was a teenager of high-school age, to whom state law mandated that FAPE be provided under the Education of the Handicapped Act, also known as the IDEA; he was thus "otherwise qualified" to participate in school.

### (3) Receipt of federal financial assistance

"Federal financial assistance" is defined to mean "any grant, loan, contract (other than a procurement contract or a contract of insurance or guaranty), or any other arrangement by which the Department [of Education] provides or otherwise makes

available assistance" in the form of funds, services of federal personnel, or certain other kinds of assistance. *Id.* § 104.3(h). Lourdesmont stated in its Statement of Material Facts that it received federal funding in a number of different ways, including medical assistance for patients in the partial-hospitalization programs and the "free lunch" program. The receipt of these forms of federal financial assistance are sufficient for the purposes of section 504.

### (4) Exclusion from participation, denial of benefits, or subjection to discrimination

The requirements of the fourth element of a section 504 violation are hotly contested: plaintiffs insist that they need not prove that defendants' conduct was intentional; defendants say proving intent is necessary.

The primary case that plaintiffs cite for the proposition that proving intentional conduct is unnecessary is *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238 (3d Cir. 1999), which flatly states: "[A] plaintiff need not prove that defendants' discrimination was intentional." *Id.* at 253 (citing *W.B. v. Matula*, 67 F.3d 484, 492 (3d Cir. 1995), *abrogated on other grounds by A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791 (3d Cir. 2007)). They cite an assortment of other cases stating essentially the same thing. *E.g.*, *Nathanson v. Med. Coll. of Pa.*, 926 F.2d 1368, 1384 (3d Cir. 1991) (citing *Alexander v. Choate*, 469 U.S. 287, 295–97 (1985)); *Colon* ex rel. *Disen-Colon v. Colonial Intermediate Unit 20*, 443 F. Supp. 2d 659, 683 (M.D. Pa. 2006) (citing *W.B.*, 67 F.3d at 492); *Indiana Area Sch. Dist. v. H.H.*, 428 F. Supp. 2d 361, 363 n.3 (W.D. Pa. 2006) (citing *Ridgewood*, 172 F.3d at 253) (discussing the ADA). Notably, a recent case in the Middle District of Pennsylvania also held that section 504 liability does not require discrimination. *Vicky M. v. Ne. Educ. Intermediate Unit*, No. 06-1898, 2009 WL 4044711, at *5 (M.D. Pa. Nov. 20, 2009) (Caputo, J.).

Although defendants go to considerable lengths to thoroughly canvass the section 504 standards in other jurisdictions, the fact that their research cannot get around is that the controlling precedent in the district courts of the Third Circuit is Third Circuit case law. In the Third Circuit, intentional discrimination simply is not a required element of a section 504 claim. The cases establishing this standard can all be traced back to *Alexander*, which concisely explains why intentional discrimination is not required:

> Discrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect. . . . Federal agencies and commentators on the plight of the handicapped similarly have found that discrimination against the handicapped is primarily the result of apathetic attitudes rather than affirmative animus.
>
> In addition, much of the conduct that Congress sought to alter in passing the Rehabilitation Act would be difficult if not impossible to reach were the Act construed to proscribe only conduct fueled by a discriminatory intent.

*Alexander*, 469 U.S. at 296–97. However, a mere showing of disparate impact is not enough. *Id.* at 298. The middle-ground standard in the Third Circuit states that "[a] plaintiff cannot make out a [Rehabilitation Act] claim simply by proving (1) that he was denied some service and (2) he is disabled. The state must have failed to provide the service for the sole reason that the child is disabled." *Andrew M. v. Del. Cnty. Office of Mental Health & Mental Retardation*, 490 F.3d 337, 350 (3d Cir. 2007) (citing *Menkowitz v. Pottstown Mem'l Med. Ctr.*, 154 F.3d 113, 124 (3d Cir. 1998)).

In this case, then, the question is whether defendants (or some subset of them) denied Adam the service of a free, appropriate public education for the sole reason of his disability.

The provision of FAPE as required by the Rehabilitation Act, defined in the implementing regulations at 34 C.F.R. § 104.33, is subject to the same standard as FAPE under the IDEA. *Chambers* ex rel. *Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009) (citing *McDonald v. Pennsylvania*, 62 F.3d 92, 95 (3d Cir. 1995)); *W.B. v. Matula*, 67 F.3d 484, 492 (3d Cir. 1995), *abrogated on other grounds by A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791 (3d Cir. 2007) (citing 34 C.F.R. § 104.33(a)).

The school providing educational services need not "maximize the potential of handicapped children." *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 577 (3d Cir. 2000) (quoting *Hendrick Hudson Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176, 200 (1982)). However, the educational program must provide "significant learning" and confer a "meaningful benefit." *Lauren W.* ex rel. *Jean W. v. DeFlaminis*, 480 F.3d 259, 272 (3d Cir. 2007) (quoting *Ridgewood Bd. of Educ. v. N.E.* ex rel. *M.E.*, 172 F.3d 238, 247 (3d Cir. 1999)).

Determining whether Adam was denied FAPE "for the sole reason" that he was disabled is a fact-intensive inquiry that involves applying an ill-defined standard. Given the uncertainties inherent in the analysis, especially because of the unusual circumstances of this case, it will be instructive to review the facts and dispositions in other cases investigating similar questions.

It does not violate the Rehabilitation Act for a state to effect a denial of service that prevents a would-be recipient from enjoying a service to which entitlement arises only on the basis of a disability, so long as the denial was not itself on the basis of disability. *Andrew M. v. Del. Cnty. Ofc. of Mental Health & Mental Retardation*, 490 F.3d 337, 350 (3d Cir. 2007). *Andrew M.* involved two toddlers, fraternal twins, who suffered from certain disabilities and were entitled under Part C of the IDEA to "early intervention [EI] services" that were to be provided in their "natural environment." *Id.* at 347 (citing 20 U.S.C. §§ 1431, 1432). The Delaware County Office of Mental Health and Mental Retardation (County) did provide EI services, but failed to do so in the toddlers' natural environment. *Id.* at 346–47. The Third Circuit held that although the County's failure constituted a violation of the IDEA, it did not violate the Rehabilitation Act, reasoning that "the twins' services fell short . . . not because they were disabled, . . . but because the County misunderstood the concept of natural environment." *Id.* at 350.

Applying the Rehabilitation Act in an employment context, the Third Circuit held that a plaintiff–doctor's allegations that the hospital at which he worked (a) knew of his

handicap, (b) engaged in a yearlong "pattern of harrassment and intimidation," and then (c) "suspended staff privileges without notice or explanation" were sufficient to give rise to an inference that the plaintiff's staff privileges were suspended solely by reason of his handicap. *Menkowitz v. Pottstown Mem'l Med. Ctr.*, 154 F.3d 113, 125 (3d Cir. 1998). Even though it was possible to draw "contrary inferences," the court indicated that the facts as alleged were sufficient to survive a motion to dismiss under Rule 12(b)(6). *Id.*

Evidence of denial of FAPE resulting from an abusive teacher and inappropriate training and oversight may be sufficient for a section 504 claim to survive a motion for summary judgment. *Vicky M. v. Ne. Educ. Intermediate Unit*, No. 06-1898, 2009 WL 4044711, at *1–3, 5 (M.D. Pa. Nov. 20, 2009). In *Vicky M.*, there was "at least some evidence on the record" to show that Susan Wzorek, an NEIU employee and teacher in an autistic-support class at Clarks Summit Elementary School, was "really aggressive" in her classroom management, and disciplined her students in an array of abusive methods, including backhanding students, screaming into their faces, and using bungee cords for restraint and discipline. *Id.* at *2. Although NEIU had policies detailing requirements for reporting student abuse, there was a "code of silence" at the school that discouraged teachers from reporting abusive conduct. *Id.* at *3. When some teacher's aides finally reported Wzorek's behavior, teachers at the school refused to allow the aides into their classrooms, eventually leading the district to request that the special-education class be moved entirely out of Clarks Summit Elementary. *Id.* The court held that the plaintiffs had produced sufficient evidence that "the denial of [FAPE] occurred or was allowed to continue because of the students' particular needs and limited communications skills" and affirmed its denial of summary judgment to the defendants. *Id.* at 5.

These precedents, only loosely analogous or applicable to the case at bar, do not point to any clear answer. On the one hand, the environment at Lourdesmont was, in many senses, awful. Fights occurred daily; students perpetrated violence against each other and against teachers, walked out of classes, and damaged school property. With a

maximum of three staff members available to respond to fights, and only one being on duty at times, Lourdesmont had a demonstratedly, perpetually inadequate system for crisis management. Other shortcomings at Lourdesmont only compounded these problems: NEIU teachers were forbidden from intervening in fights; teachers and therapists alike had little to no training in defusing students' aggression; and numerous Lourdesmont personnel, including the principal and Adam's primary therapist, were manifestly unqualified for their positions. Against this background of institutional ineptitude is a failing more particular to Adam's situation: Lourdesmont had no autistic-support class, and enrolled Adam, who suffered from Asperger's Syndrome, despite this lack.

But on the other hand, and aside from the fight with Arthur, Adam seemed to be doing fairly well at Lourdesmont. He said he liked it there and had made friends; even years after he left the school, he said he wished he could go back. His teacher, Ms. Krieg-Grace, described the social and emotional progress that Adam had made, relating anecdotes about sorts of social skills that he had gained that individuals with autism-spectrum disorders rarely obtain. Testimony suggested that academically, Adam was performing adequately, although there is no evidence in the record of progress reports or other firm indicators of his level of academic achievement.

The evidence of record is insufficient to warrant a firm conclusion on the matter, but is sufficient to permit an inference that the extent of instructional and managerial dysfunction at Lourdesmont was such that Adam was denied FAPE while he attended there. The record does permit contrary inferences—based on evidence like Adam's report that he enjoyed Lourdesmont and Ms. Krieg-Grace's recollection that Adam was doing well, as well as the lack of positive evidence that Adam derived no academic benefit from being at Lourdesmont—but as in *Menkowitz*, these contrary inferences are not strong enough to dictate the proper conclusion.

But the denial of FAPE, which is adequate to establish a violation of the IDEA, is not by itself a violation of section 504 of the Rehabilitation Act. *Chambers* ex rel.

*Chambers v. Sch. Dist. of Phila.*, 587 F.3d 179, 189 (quoting *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 253 (3d Cir. 1999)) ("[T]he failure to provide [FAPE] violates IDEA and therefore *could* violate [the Rehabilitation Act]." (emphasis added)). Plaintiffs' case falters in the attempt to bridge the evidentiary gap between showing (1) that Adam was disabled and that he was denied FAPE and (2) that this denial was *for the sole reason* that Adam was disabled. All students at Lourdesmont were subject to the same woeful educational environment; Adam was not singled out for poor instruction. Lourdesmont lacked an autism-support classroom, which had a disproportionately negative impact on Adam, the only autistic student at Lourdesmont, but there is no evidence that the lack of an autism-support classroom was the reason that Adam suffered any of the harms that plaintiffs allege. There is nothing in the record to suggest that there was any connection between the circumstances that allowed the fight to transpire between Adam and Arthur—whether these circumstances came about because of defendants' negligence or otherwise—and the fact that Adam was disabled. Finally, unlike in *Vicky M.*, in which disabled students were subject to physical and psychological abuse by a teacher, whose abuse went unreported, uninvestigated, and undisciplined for years at least in part because of a "code of silence" among teachers, the evidence in this case reveals no mistreatment by Lourdesmont, NEIU, or District staff. Rather, the fight that led to Adam's injuries was entirely between Adam and Arthur, and regardless of the criticisms that may be levied against defendants, nothing in the record suggests a causal connection between Adam's disability and defendants' failure to provide him with FAPE. The situation is more akin to that in *Andrew M.*, where the defendants failed to provide a service properly because they did not understand what they were required to do. Here, somewhat like the misunderstanding in *Andrew M.*, it was incompetence or ignorance at the institutional level that led to Adam's denial of service. This institutional failing was not for the sole reason of Adam's disability.

Given this conclusion, there is no need to determine which of the defendants bore what degree of responsibility for ensuring that Adam received FAPE, and it is recommended that plaintiffs' section 504 claim be dismissed as to all defendants.

### (B) Negligence claim against Lourdesmont

In Count V of their complaint, plaintiffs allege that Lourdesmont "failed to adequately supervise its staff, its program, Adam, and other students/patients," and also failed to advise the District that Adam's IEP was inadequate to meet his needs, in breach of Lourdesmont's duty under the IDEA, the Rehabilitation Act, and related Pennsylvania law. (Doc. 91, ¶¶ 64–65.) The following paragraph of the complaint alleges that these failures were the cause of Adam's injuries. (*Id.* ¶ 66.) A claim for ordinary negligence requires a plaintiff to prove:

> (1) the existence of an obligation or duty recognized by law, which requires the actor to conform to a certain standard of conduct; (2) a breach or failure by defendant to conform to that duty; (3) a causal connection between the defendant's breach and resulting injury; and (4) actual damage or loss suffered by the plaintiff.

(Mem., Sept. 23, 2008, Doc. 59, at 23 (citing *Atcovitz v. Gulph Mills Tennis Club, Inc.*, 812 A.2d 1218, 1222 (Pa. 2002)).) Before embarking on an exposition of Lourdesmont's conduct, its claim of immunity must be addressed.

### (1) Lourdesmont's claim of immunity

Lourdesmont argues that even if it were negligent, it would be immune from liability under the Pennsylvania Mental Health Procedures Act (MHPA), which states:

> In the absence of willful misconduct or gross negligence, a county administrator, a director of a facility, a physician, a peace officer or any other authorized person who participates in a decision that a person be examined or treated under this act, or that a person be discharged, or placed under partial hospitalization . . . shall not be civilly or criminally liable for such decision or any of its consequences.

50 Pa. Stat. Ann. § 7114(a). Corporations, including incorporated hospitals, are included in the definition of "person." *Farago v. Sacred Heart General Hosp.*, 528 A.2d 986, 987 (Pa. Super. 1987) (citing 1 Pa. Cons. Stat. Ann. § 1991.)

Plaintiffs contend that the MHPA's immunity provisions are inapplicable, pointing to the section of the MHPA entitled "Scope of act." This section states: "This act establishes rights and procedures for all involuntary treatment of mentally ill persons, whether inpatient or outpatient, and for all voluntary inpatient treatment of mentally ill persons." 50 Pa. Stat. Ann. § 7103. According to plaintiffs, Adam was placed at Lourdesmont for daytime treatment and education under an IEP; he was not subject to involuntary treatment, either inpatient or outpatient, and he was not a voluntary inpatient at Lourdesmont. Because Adam was neither an inpatient or an involuntary outpatient, plaintiffs urge, the appropriate standard by which Lourdesmont's conduct should be evaluated is garden-variety negligence.

Plaintiff's position is at odds with the liberal interpretation of the MHPA's immunity provision that Pennsylvania courts have used. Explicitly refusing to construe section 7114 narrowly, the Pennsylvania Supreme Court had held that the MHPA affords immunity to doctors and hospitals even when the course of treatment is not "specifically directed at a mental illness." *Allen v. Montgomery Hosp.*, 696 A.2d 1175, 1179 (Pa. 1997). The *Allen* court reasoned that a narrow construction of section 7114 would contravene the "clear public policy" of the MHPA "to make adequate treatment available to mentally ill patients with the least restrictions to their person." *Id.* Narrowly interpreting section 7114 might also lead "providers of medical care to minimize their risks by placing the mentally ill patients in a more restrictive environment than is necessary or adopting other precautionary measures [that] would increase the costs of the medical care provided to the mentally ill." *Id.*

There can be no real dispute that Adam underwent outpatient treatment at Lourdesmont; the only residual question would be whether his treatment was involuntary.

34

As the *Allen* court liberally interpreted the meaning of "treatment" under section 7114, the meaning of "involuntary" should be accorded similar breath. From this vantage, the following facts are salient: Adam was a minor at the time of his placement at Lourdesmont, and was in the legal custody of his parents; Adam's mother Maura felt she had no choice but to place Adam at Lourdesmont; and a Lourdesmont therapist examined Adam as part of the intake procedure, determining in the process that his placement there was medically necessary. Adam did not have a choice to opt out of attending Lourdesmont, and such a lack of choice is the essence of involuntariness.

Accordingly, the immunity provision of section 7114 applies to Lourdesmont in this case; plaintiffs may only defeat Lourdesmont's claim to immunity by showing that Lourdesmont's acts were willful or grossly negligent.

### (2) Gross negligence

For purposes of the MHPA, the Pennsylvania Supreme Court has defined "gross negligence" as "more than ordinary carelessness, inadvertence, laxity, or indifference. The behavior of the defendant must be flagrant, grossly deviating from the ordinary standard of care." *Albright v. Abington Mem'l Hosp.*, 696 A.2d 1159, 1164 (Pa. 1997) (quoting *Bloom v. DuBois Reg'l Med. Ctr.*, 597 A.2d 671, 679 (Pa. Super. 1991)). The question of whether a defendant has been negligent is "particularly committed to determination by a jury. It is an issue that may be removed from consideration by a jury and decided as a matter of law only where the case is entirely free from doubt and there is no possibility that a reasonable jury could find negligence." *Id.* (citing *Bloom*, 597 A.2d at 679–80). Similarly, when the question is whether the defendant committed gross negligence, a court may decide the issue as a matter of law only if no reasonable jury could find gross negligence. *Id.* at 1165 (citing *Willett v. Evergreen Homes, Inc.*, 595 A.2d 164 (Pa. Super. 1991)).

In this case, it is hardly a foregone conclusion that Lourdesmont was not grossly negligent in providing FAPE. In its brief supporting its motion for summary judgment, Lourdesmont's argument on the subject of negligence essentially consists only of an insistence that section 7114 of the MHPA applies, then flatly stating that it is entitled to summary judgment because plaintiffs "have failed to provide any evidence of gross negligence or willful misconduct." (Lourdesmont's Br. Supp. Summ. J., Doc. 156, at 12.) This conclusory proclamation is unconvincing.

Evidence shows that not only was Adam denied FAPE, as discussed in Part III.A.4 *supra*, but that the environment at Lourdesmont was so toxic to learning that fights occurred daily and the police were called over 300 times in a nine-year period. Lourdesmont routinely turned away the police when they were called for riots. There is no evidence that Lourdesmont ever took measures to try to prevent future fights; all the training that Lourdesmont offered in crisis management was entirely voluntary. Both of the adults presiding over Adam's classroom—Ms. Krieg-Grace, the teacher, and Ms. McDonald, the aide—had little to no training in how to handle emotionally disturbed children. When Ms. Krieg-Grace spoke to the principal of Lourdesmont, Barry Rogers, about her concerns regarding student behavior, Rogers yelled at her and told her she was overreacting. Meanwhile, fights broke out every day; students hurt each other and their teachers; and school property got damaged or destroyed. This and other evidence,[25] detailed and discussed above, paints a picture of Lourdesmont as a place that actively avoided addressing the serious issues regarding student safety that presented themselves daily. Such evidence supports an inference that Lourdesmont was grossly negligent in its failure to supervise and its failure provide Adam with FAPE.

---

[25] It is unnecessary at this stage of litigation to provide a belabored recitation of the facts in evidence that support a finding of gross negligence; the only task before the Court is determining whether a reasonable jury could find that Lourdesmont was grossly negligent, and the clear answer is that such a jury could.

But as for Lourdesmont's conduct regarding Adam's IEP, no reasonable jury could find Lourdesmont grossly negligent. The complaint makes two allegations in this vein: (1) that Lourdesmont failed to ensure that Adam's IEP was adequate to meet his needs and (2) that Lourdesmont failed to inform the District that the IEP was inadequate. There is no evidence to support the first contention.[26] The second contention, even accepted as true as

---

[26]There are only two matters that appear in the record with possible relevance to the question of negligence in developing Adam's IEP. First is testimony from Lee Carr that the behavior-management plan in one of Adam's IEPs was "not appropriate" and should have been "more defined to him." (Carr. Dep. 23:18–24:12, June 23, 2009, Doc. 144-19, at 3–4.) Although this could support a finding of negligence, Carr's testimony does not show a flagrant or gross deviation from the standard of care. More importantly, there is no indication of which IEP Carr was talking about. The IEP in question was apparently labeled "Carr-2" (*see id.*), but no document by this label appears in the record.

Second is testimony and documentary evidence concerning what may be a Behavior Management Plan (BMP) for Adam. Plaintiffs filed as Exhibit K (Doc. 144-14) a single page that they describe as an excerpt from a BMP for Adam dated March 2004 (Doc. 142, ¶ 39), although there is nothing in the record that identifies what the document actually is, who wrote it, when it was written, or for what purpose. The document states: "Adam often feels the need to defend smaller or younger peers when he feels they are being mistreated or in defending the instructor where there [are] situations where he feels they are being disrespected." (Doc. 144-14.) Plaintiffs cite Edmunds Dep. 82, June 23, 2009, Doc. 144-15, at 1, in support of their claim that this Exhibit K was shared by Dan Edmunds, a Behavioral Specialist from Youth Advocate Programs, at the interagency meeting before Adam was placed at Lourdesmont, but the cited page does not support this proposition. (Doc. 142, ¶ 39.) Plaintiffs also cite Edmunds Dep. 80 for the proposition that "Edmunds specifically testified that he provided this Plan to Carr" before Adam began attending Lourdesmont, but plaintiffs did not include this page in their exhibits. (*Id.*) Plaintiffs further cite Edmunds Dep. 87 for the proposition that "Edmunds also warned the team that he had concerns that 'something could arise from' Adam being in a population of students with challenging behaviors," but the cited page makes reference only to "that meeting," with no indication of who was present or what the date was. (*Id.*) Thus plaintiff's whole discussion on this point, which was intended to show that Lourdesmont knew that Adam's placement there could be problematic and that at the

would be done when reviewing a motion to dismiss, indicates nothing more than a failure to inform, which is a classic form of garden-variety negligence.

It is therefore recommended that Lourdesmont's motion for summary judgment be denied with respect to plaintiff's negligence claim, with the caveat that plaintiffs may proceed on this issue only on the question of whether Lourdesmont was grossly negligent in providing FAPE or in supervising its staff, program, and students.

### (C) Breach of contract

In their complaint, plaintiffs allege that Adam was a third-party beneficiary of a contract among defendants to provide FAPE to Adam in a safe environment, and that in failing to do so, defendants breached this contract. The complaint does not specify what kind of contract defendants had among them; the allegations include no detail about whether the contract was oral or written, when it was executed, or any of its explicit terms.

From the briefs submitted with the pending motions for summary judgment, it becomes clear that the parties are arguing past each other on the contract issue. Plaintiffs argue that the May, 18, 2004 Notice of Recommended Educational Placement (NOREP) (Doc. 144-5) is a contract binding defendants to provide Adam with FAPE in a safe environment. (Doc. 143, at 43–44; Doc. 144, at 35–37; Doc. 159, at 41–42.) Lourdesmont argues that it was not responsible for providing FAPE because it was not in charge of Adam's education (Doc. 156, at 12); NEIU argues that the District–NEIU contract executed March 1, 2004 (Doc. 144-27) makes no mention of providing "FAPE in a safe environment" and that Adam is not a third-party beneficiary (Doc. 127, at 9–12), and the District similarly argues that Adam is not a third-party beneficiary to the District–NEIU

---

least, Adam's IEP should have reflected this knowledge gleaned from Edmunds' BMP, is without evidentiary support and does not aid their argument.

contract (Doc. 131, at 27–30) and that plaintiffs' contract claim is actually a claim for "educational malpractice" (*id.* at 30–31).

The standard by which a contract claim is adjudged is well established in Pennsylvania law:

> [A] plaintiff seeking to proceed with a breach of contract action must establish (1) the existence of a contract, including its essential terms, (2) a breach of duty imposed by the contract[,] and (3) resultant damages. To prove damages, a plaintiff must give a factfinder evidence from which damages may be calculated to a reasonable certainty. At a minimum, reasonable certainty embraces a rough calculation that is not too speculative, vague[,] or contingent upon some unknown factor.

*Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225–26 (3d Cir. 2003) (quoting *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. 1999); *ATACS Corp v. Trans World Commc'ns, Inc.*, 155 F.3d 659, 668, 669 (3d Cir. 1998)) (internal quotation marks omitted) (first alteration in original). Signatures are not, as a general rule, required to create a contract, unless signing is "expressly required by law or by intent of the parties." *Beaver Dam Outdoors Club v. Hazleton City Auth.*, 944 A.2d 97, 103 (Pa. Commw. 2008) (citing *Hartman v. Baker*, 766 A.2d 347 (Pa. Super. 2000); Restatement (Second) of Contracts § 27 (1981)).


### (1) The May 18, 2004, NOREP

Turning first to plaintiffs' argument, plaintiffs cannot succeed on their breach-of-contract claim by predicating it on the May 18, 2004, NOREP, as this document cannot be considered a contract that guarantees FAPE in a safe environment to Adam. Although "a student can bring a cause of action against [a private educational] institution for breach of contract where the institution ignores or violates portions of the written contract" that

governs the student–institution relationship,[27] *Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa. Super. 1999) (citations omitted), the NOREP does not represent such a contract.

Significantly, the NOREP never uses the term "FAPE" or the phrase "free appropriate public education," and makes no mention of a "safe environment." Instead, it speaks in vague terms about provision of emotional support and making a "more restrictive placement" for Adam. (Doc. 144-5, at 1.) Since provision of FAPE in a safe environment was allegedly one of the essential terms of the contract, these words, something equivalent to them, or at least something that makes indirect reference to them, would have to appear in the putative contract, but they do not appear in the NOREP.

### (2) The District–NEIU contract

Both the District and the NEIU argue that the contract between them (Doc. 130-8) does not include Adam as a third-party beneficiary, and that they consequently cannot be held liable for any breach of that contract. Under traditional principles that guide the determination of whether a given person is a third-party beneficiary to a contract, the District and the NEIU are correct. *See, e.g.*, *Pell v. Weinstein*, 759 F. Supp. 1107, 1119 (M.D. Pa. 1991) (quoting *Dept. of Gen. Servs. v. Cell-Flynn*, 540 A.2d 1365, 1368 (Pa. Commw. 1988) ("[T]he obligation to the third party must be created, and must affirmatively appear, in the contract itself.")).

However, under *Swartley*, a student at a private institution may be able to bring a breach-of-contract claim against the institution, as the student is considered a party to the contract under which the student is being educated. "The contract between a private institution and a student is comprised of the written guidelines, policies, and procedures as contained in the written materials distributed to the students over the course of [the

---

[27] The District was incorrect in its statement that "educational malpractice is not a recognized theory of recovery" in Pennsylvania. (Doc. 131, at 23.)

student's] enrollment in the institution." *Swartley*, 734 A.2d 915, 919 (Pa. Super. 1999) (citing *Merrow v. Goldberg*, 672 F. Supp. 766, 774 (D. Vt. 1987) ("The terms of the contract are contained in the brochures, course-offering bulletins, and other official statements, policies, and publications of the institution.")) Based on this standard, then, what plaintiffs must prove is twofold: that (1) the institution in question is a private one, and (2) the contractual provision allegedly breached was part of the "written materials" distributed to plaintiffs through the course of Adam's enrollment.

Application of *Swartley* in this case leads to the conclusion that plaintiffs have no viable breach-of-contract claim against any of the defendants. First, there is no dispute that the District is not a private entity. Second, although it is unclear what role Lourdesmont played vis-à-vis Adam's education and the policies for which educational entities were responsible for implementing, there is no dispute that Lourdesmont was not a party to the District–NEIU contract. Third, plaintiffs have introduced no evidence to show that NEIU is a private entity; nothing in the record speaks to this matter. Fourth, there is no evidence to suggest that the District–NEIU contract was any part of the "written materials" that constituted "guidelines, policies, and procedures" at the District, at the NEIU, or at Lourdesmont, or that a copy of this contract was ever distributed to plaintiffs during Adam's enrollment at Lourdesmont. Fifth and finally, plaintiffs' briefs failed to address defendants' arguments regarding the District–NEIU contract, instead focusing on the May 18, 2004, NOREP; plaintiffs' failure to respond to these arguments is enough for those arguments to be deemed unopposed.[28]

----

[28]Although Lourdesmont did not address the District–NEIU contract in its brief, conclusions regarding this contract apply equally to Lourdesmont as to the District and the NEIU, above and beyond the fact that there is no dispute that Lourdesmont was not a party to this contract, as the District–NEIU contract is the only contract in evidence that could have been the subject of a breach-of-contract claim.

It is therefore recommended that defendants' motions for summary judgment be granted with respect to plaintiffs' breach-of-contract claim.

### (D) Loss of consortium

Plaintiff Maura C. has claimed for loss of consortium based on "denial of [her] right to the comfort, companionship, and society . . . of [her] son as a consequence of the Defendants' continual failures to offer him FAPE and to comply with federal and state law," namely, IDEA and section 504 of the Rehabilitation Act. (Doc. 91, ¶ 74.) The NEIU and the District seek summary judgment in their favor on this claim.

Based on the Court's prior memorandum and order of September 23, 2008 (Doc. 59), plaintiffs' loss-of-consortium could be predicated only upon the survival of their section 504 claim. In light of the foregoing recommendation that summary judgment be granted for defendants on the section 504 claim, it is also recommended that summary judgment be granted on the loss-of-consortium claim.

### (E) Claims based upon the ADA

Plaintiffs allege violations of the ADA against all defendants in Count VIII of their complaint; defendants Lourdesmont and the NEIU move for summary judgment.

The Middle District of Pennsylvania has previously held that "[t]he pleading requirements under the Rehabilitation Act and ADA are the same, except that an ADA plaintiff need not show that the school receives federal funds." *Weidow v. Scranton Sch. Dist.*, No. 08-1978, 2009 WL 2588856, at *5 (M.D. Pa. Aug. 19, 2009) (Caputo, J.) (citing *Calloway v. Boro of Glassboro Dep't of Police*, 89 F. Supp. 2d 543, 551 (D.N.J. 2000)). As discussed in Part III.A *supra*, plaintiffs have not established a violation of section 504 of the Rehabilitation Act; because their ADA claim is subject to the same standard, this claim fails as well.

It is therefore recommended that defendants' motions for summary judgment be granted with respect to plaintiff's claims under the ADA.[29]

## IV. Conclusion

Based on the foregoing discussion, it is recommended that defendants' motions for summary judgment be GRANTED with respect to Count I, under section 504 of the Rehabilitation Act; Count VI, for breach of contract; Count VII, for loss of consortium; and Count VIII, under the ADA. It is recommended that Lourdesmont's motion be DENIED with respect to Count V, for negligence.

s/ William T. Prince
William T. Prince
United States Magistrate Judge

December 16, 2010

---

[29]Although the District did not move for summary judgment on the ADA claims, the arguments of the other defendants apply equally to the District, and their success on this portion of the motion indicates that dismissal of the ADA claims against the District is also appropriate.